## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Garrett Andrews individually, and on
behalf of all others similarly situated,

Plaintiff,

v.

National Football League, Arizona
Cardinals, Inc., Atlanta Falcons Football
Club LLC, Baltimore Ravens Limited
Partnership, Buffalo Bills, Inc., Panthers
Football LLC, Chicago Bears Football
Club, Inc., Cincinnati Bengals, Inc.,
Cleveland Browns LLC, Dallas Cowboys
Football Club, Ltd., Denver Broncos
Football Club, Detroit Lions, Inc., Green
Bay Packers, Inc., Houston NFL Holdings
LP, Indianapolis Colts, Inc., Jacksonville
Jaguars Ltd., Kansas City Chiefs Football
Club, Inc., Miami Dolphins, Ltd.,
Minnesota Vikings Football Club LLC,
New England Patriots, LP, New Orleans
Louisiana Saints, LLC, New York Football
Giants, Inc., New York Jets Football Club,
Inc., Oakland Raiders LP, Philadelphia
Eagles Football Club, Inc., Pittsburgh
Steelers Sports, Inc., San Diego Chargers
Football Co., San Francisco Forty Niners
Ltd., Football Northwest LLC, The Rams
Football Co. LLC, Buccaneers Limited
Partnership, Tennessee Football, Inc.,
Washington Football Inc.

Defendants.

-----------------------------------------------------x

Civil No. _____  (\_\_/\_\_)

CLASS ACTION COMPLAINT

**INTRODUCTION**

1.      This class action is brought to enjoin violations by each defendant of the federal antitrust laws and for declaratory relief as described below.  Plaintiff is a prospective professional football player who seeks to enter the league as a rookie.

2.      The Defendants are the NFL and its 32 member teams. Although the NFL might be viewed as a type of joint venture, The United States Supreme Court held last year in *American Needle, Inc. v. NFL*, 130 S.Ct. 2201, 2212-13 (2010) that each member team is legally capable of conspiring with other member teams in violation of the antitrust laws:

> The NFL teams do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action. Each of the teams is a substantial, independently owned, and independently managed business. "[T]heir general corporate actions are guided or determined" by "separate corporate consciousnesses," and "[t]heir objectives are" not "common." ... The teams compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel.

3.      The NFL is also an adjudicated monopolist that acquired its monopoly power in the market for professional football in violation of Section 2 of the Sherman Act (15 U.S.C. §2). Thus, in *United States Football League v. NFL*, 644 F. Supp. 1040, 1057-58 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ("*USFL*"), the court upheld jury determinations that (a) the NFL held monopoly power in the professional football market, receiving 95% of the revenues from major league professional football and (b) it had acquired that power through "predatory conduct."

1

These findings have been given collateral estoppel effect in subsequent antitrust cases against the NFL. *E.g.*, *McNeil v. NFL*, 790 F.Supp. 871, 889-96 (D. Minn. 1992) ("*McNeil II*"). Those findings are entitled to similar effect in this case.

      4.     The NFL has also been determined to have abused its dominant position in the market for professional football services, which is the relevant market at issue in this case. For example, in *Mackey v. NFL*, 543 F.2d 606 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801 (1977) ("*Mackey*"), the issue was the validity of the "Rozelle Rule," which decreed that when a football player's contract with an NFL club expired and he moved to a different club, his present employer had to provide compensation to his former employer, with the NFL Commissioner resolving any dispute. The United States Court of Appeals for the Eighth Circuit upheld the district court's determination of liability after a 55-day trial. The appellate court found that the relevant market was one for professional football services (*id.* at 617-18) and that the "Rozelle Rule, as enforced, unreasonably restrains trade in violation of §1 of the Sherman Act" (*id.* at 622).

      5.     Likewise, it has been determined that the NFL's College Draft "cannot be regarded as 'reasonable' under the antitrust laws." *Smith v. Pro-Football*, 420 F. Supp. 738, 747 (D.D.C. 1976), *aff'd in part and rev'd in part on other grounds*, 593 F.2d 1173 (D.C. Cir. 1978) ("*Smith*"). This determination as well is entitled to collateral estoppel effect here.

      6.     Similarly, after a ten-week trial, a jury in another case held that the NFL's conspiratorial Right of First Refusal/Compensation rules (known as "Plan B" Rules) that limited the mobility of professional football players after their contracts

expired and they became "free agents" had a "a substantially harmful effect on competition in the relevant market for the services of professional football players." *McNeil v. NFL*, No. 4-90-476, 1992 WL 315292 at *1 (D. Minn. Sept. 10, 1992) (*"McNeil III"*).

7.    In 1992, a group of players brought suit seeking relief for injuries they suffered as a result of the very same anticompetitive restraints that the jury in *McNeil III* found violated Section 1 of the Sherman Act. In *Jackson v. NFL*, 802 F.Supp. 226 (D. Minn. 1992) ("*Jackson*"), the district court gave collateral estoppel effect to the jury's findings. *Id.* at 229-30. It then issued a temporary restraining order against the enforcement of the Plan B Rules, stating that "the four players who remain restricted by the Plan B rules make a sufficient showing of irreparable harm because they suffer irreparable injury each week they are restricted under an illegal system of player restraints." *Id.* at 230-31.

8.    In this case, the Defendants--the NFL and its separately-owned and independently-operated member teams--have jointly agreed and conspired to deny class members the ability to provide and/or market their services in the major league market for professional football players through an unlawful group boycott and price-fixing arrangement and through anticompetitive restraints on the market freedom of prospective players. This boycott has included a lockout of rookie players seeking an NFL contract for the first time. The admitted purpose of this group boycott is to coerce Plaintiff and the other players to agree to a new anticompetitive system of players' restraints that will, *inter alia*, drastically reduce prospective player compensation levels.

9.     The group boycott, concerted refusals to deal and price-fixing that Defendants are carrying out are *per se* illegal acts under Section 1 of the Sherman Act (15 U.S.C. § 1). They also constitute an unreasonable restraint of trade under the rule of reason. As a result of Defendants' anticompetitive agreements, future professional football players who are seeking employment by an NFL club, will be prevented from offering or providing their services in a competitive market and from receiving a competitive market value for their services, and will be denied the freedom of movement available to employees in virtually every other industry in the United States.

## JURISDICTION AND VENUE

10.     These claims arise and are brought under Section 16 of the Clayton Act (15 U.S.C. § 26), and Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1).

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337.

12.     Venue in this action is proper pursuant to 15 U.S.C. § 22. Each of the Defendants can be found, resides, has an agent, or transacts business in the District of Minnesota, and the unlawful activities were or will be carried on in part by one or more of the Defendants within this district.

## THE PARTIES

13.     Plaintiff Garrett Andrews ("Andrews") has played as a wide receiver on the Blue Raiders Football Bowl Subdivision (formerly Division I) college football team at Middle Tennessee State University ("MTSU"). Andrews played for MTSU for the 2009 and 2010 college football seasons. Andrews is a 6' 3," 208 pound, wide receiver from Tracy, CA.

Andrews was a key receiver for the Blue Raiders football team in 2010 with 34 receptions for

377 yards and 2 touchdowns. As a junior, Andrews played in all 13 games with 12 starts and 35

receptions for 530 yards and 4 touchdowns. In the 2009 season ending Blue Raider victory over

Southern Mississippi in the New Orleans Bowl, Andrews led his team with 51 yards receiving

and one touchdown. Andrews earned All-California junior college first team honors at San

Joaquin Delta College and led the Valley Conference in all receiving categories in 2008 before

signing with Sun Belt Conference member MTSU. Andrews participated in the annual Pro Day

activities for future NFL players at MTSU on March 23, 2011 in front of NFL scouts and

coaches. He has hired an agent and is draft eligible and intends to enter the NFL College Draft

and become a professional football player in the NFL. He has not commenced any negotiations

with any NFL member club concerning employment as a player.

14.     Defendant NFL, which maintains its offices at 280 Park Avenue,

New York, New York, is an unincorporated association consisting of the 32 separately-

owned and independently-operated professional football teams that are listed below. The

NFL is engaged in interstate commerce in the business of, among other things, operating

the sole major professional football league in the United States.

15.     The other Defendants are the 32 NFL member teams, each of which,

upon information and belief, is a corporation, except where noted below. The NFL and its

member teams are referred to collectively herein as "NFL Defendants." Upon

information and belief, each of the Defendant teams is a separately-owned and

independent entity which operates a professional football franchise for profit under the

team name and in the cities set forth below:

| NFL Defendant Team Owner | State of Organization | Team Name (City) |
|---|---|---|
| Arizona Cardinals, Inc. | Arizona | Arizona Cardinals |
| Atlanta Falcons Football Club LLC | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership | Maryland | Baltimore Ravens |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Panthers Football LLC | North Carolina | Carolina Panthers |
| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |
| Cleveland Browns LLC | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| Denver Broncos Football Club | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston NFL Holdings LP | Delaware | Houston Texans |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |
| Jacksonville Jaguars Ltd. | Florida | Jacksonville Jaguars |
| Kansas City Chiefs Football Club, Inc. | Texas | Kansas City Chiefs |
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club LLC | Minnesota | Minnesota Vikings |
| New England Patriots, LP | Delaware | New England Patriots |

| | | |
|---|---|---|
| New Orleans Louisiana Saints LLC | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders LP | California | Oakland Raiders |
| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| San Diego Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty Niners Ltd. | California | San Francisco 49ers |
| Football Northwest LLC | Washington | Seattle Seahawks |
| The Rams Football Company LLC | Delaware | St. Louis Rams |
| Buccaneers Limited Partnership | Delaware | Tampa Bay Buccaneers |
| Tennessee Football, Inc. | Delaware | Tennessee Titans |
| Washington Football, Inc. | Maryland | Washington Redskins |

## CLASS ACTION

16.     Plaintiff is a representative of a class, as defined by Rule 23(b)(1) and/or Rule 23(b)(2) of the Federal Rules of Civil Procedure, and brings this action on behalf of himself and a class with respect to which the NFL has acted or refused to act on grounds that apply generally to the class.

17.     The class is composed of potential rookie professional football players who, as of March 11, 2011 to the date of final judgment in this action and the

7

determination of any appeal therefrom, have not previously commenced negotiation with any NFL club concerning employment and have not been selected in any NFL College Draft.

18.     The class consists of persons who do not fall within the definition of the Collective Bargaining Unit ("CBU") contained in the 2006-12 Collective Bargaining Agreement ("CBA") between the NFL Management Council and the NFL Players Association ("NFLPA"). The "Preamble" to that CBA describes the CBU as follows:

> This Agreement, which is the product of bona fide, arm's length collective bargaining, is made and entered into as of the 8th day of March, 2006, in accordance with the provisions of the National Labor Relations Act, as amended, by and between the National Football League Management Council ("Management Council" or "NFLMC"), which is recognized as the sole and exclusive bargaining representative of present and future employer member Clubs of the National Football League ("NFL" or "League"), and the National Football League Players Association ("NFLPA"), which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL in a bargaining unit described as follows:
>
> 1. All professional football players employed by a member club of the National Football League;
>
> 2. All professional football players who have been previously employed by a member club of the National Football League who are seeking employment with an NFL Club;
>
> 3. All rookie players once they are selected in the current year's NFL College Draft; and
>
> 4. All undrafted rookie players once they commence negotiation with an NFL Club concerning employment as a player.

19.     The class is so numerous and geographically so widely dispersed that joinder of all members is impracticable. There are questions of law and fact common to the class. Plaintiff's claims are typical of the claims of the class that he represents, and Plaintiff will fairly and adequately protect the interests of the proposed class.

20.     Each person in the class is, has been, and/or will be subject to uniform agreements, rules and practices among the Defendants that restrain competition for player services, including, but not limited to, those described herein as the "lockout" and all restraints of trade that the lockout seeks to further.

21.     The prosecution of separate actions by individual members of the class would create the risk of:

(a)     inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(b)     adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

22.     In construing and enforcing their uniform agreements, rules and practices, and in taking and planning to take the actions described in this complaint, the Defendants have acted or refused to act on grounds that apply generally to the class, so

9

that final injunctive relief or corresponding declaratory relief would be appropriate for the class as a whole.

23.    A class action may be maintained under Rule 23(b)(2) when the exclusive relief sought is injunctive relief.

## NATURE OF INTERSTATE TRADE AND COMMERCE

24.    The primary business in which Defendants are engaged is the operation of major league professional football teams and the sale of tickets and telecast rights to the public for the exhibition of the individual and collective football talents of players such as the Plaintiff. To conduct this business, the NFL Defendants must compete with each other for and retain the professional services of players, such as Plaintiff, who were or will be signed to contracts to play football for the various NFL defendant teams.

25.    The business of major league professional football is distinct from other professional sports businesses, as well as from college and minor league professional football.  Its distinguishing features include:  the rules of the sport and the season during which it is played; the talents of and rates of compensation for the players, for which playing football is their full-time profession; the nature and amounts of trade and commerce involved; and the unique demand for the NFL Defendants' games by the consuming public, both as ticket purchasers and as home viewers of and listeners to television and radio.

26.    The NFL Defendants' operation of and engagement in the business of major league professional football involves a substantial volume of interstate trade and

commerce, including, *inter alia*, the following interstate activities: travel;

communications; purchases and movement of equipment; broadcasts and telecasts of

league games; advertisements; promotions; sales of tickets and concession items; sales of

merchandise and apparel; employment of players and referees; and negotiations for all of

the above.

27.     The NFL Defendants' aforementioned interstate transactions involve

collective annual expenditures and receipts in excess of $9.3 billion. But, as Dan Greeley,

CEO of Network Insights, has noted:

> The NFL is like Procter & Gamble. There's the holding
> company, the core operation, but then each brand has its own
> team and world of revenue. Like Tide: That's a P&G product
> but within that there are different types of Tide and a number
> of people that make money from it. So the $9.3 billion pie
> just scratches the surface and doesn't get into how much is
> spent around stadiums, merchandise, agents, all the way down
> to mom-and-pop shops.

28.     Annually, the NFL redistributes upwards of $4 billion in radio,

television and digital earnings across its 32 teams—$125 million apiece, plus an equal

share for the league—and that number shows no sign of declining. The 19 highest-rated

fall television programs (and 28 of the top 30) were NFL games, and this year's Super

Bowl was the most-watched program ever. The NFL earns huge amounts annually from

its telecasting deals with, *inter alia*, ESPN ($1.1 billion), DirecTV ($1 billion), NBC

($650 million), Fox ($712.5 million), and CBS ($622.5 million).

29.     Companies pour money into the league's coffers for the right to

associate their brands with the NFL. Among those making such contributions are Pepsi

11

($560 million over eight years, starting in 2004) and Gatorade ($45 million a year, plus marketing costs and free Gatorade for teams). Verizon is paying $720 million over four years to be the league's wireless service provider. Nike paid $1.1 billion to acquire the NFL's apparel sponsorship. Previous partner Reebok had been selling $350 million annually in NFL-themed gear. The league has a $1.2 billion, six-year deal with beer sponsor Anheuser-Busch, but teams still cut their own deals when it comes to naming rights at stadiums.

  30. Teams can collect $25-$30 million for stadium naming rights, usually on 10-year deals. The largest is Reliant Energy's $10 million per year contract with the Houston Texans. In Los Angeles, Farmers Insurance has promised $700 million over 30 years to name a stadium for a team that doesn't exist yet.

  31. Many NFL clubs own in whole or in part the stadiums in which they play, which can be a source of major commercial value, as reflected in the following chart:

| STADIUM, TEAM | OPENED | PRICE (2010 DOLLARS) | % PRIVATE |
|---|---|---|---|
| New Meadowlands, NY | 2010 | $1.6B | 100 |
| Cowboys Stadium, DAL | 2009 | $1.15B | 56 |
| Lucas Oil Field, IND | 2008 | $780M | 13 |
| U. of Phoenix Stadium, ARI | 2006 | $493M | 32 |

| | | | |
|---|---|---|---|
| Lincoln Financial, PHI | 2003 | $588M | 65 |
| Ford Field, DET | 2002 | $504M | 49 |
| Gillette Stadium, NE | 2002 | $373M | 100 |
| Reliant Stadium, HOU | 2002 | $526M | 39 |
| Qwest Field, SEA | 2002 | $422M | 29 |
| Invesco Field, DEN | 2001 | $683M | 39 |
| Heinz Field, PIT | 2001 | $312M | 16 |

32.     In 2010, more than 17 million fans passed through NFL turnstiles, paying anywhere from $54.51 (Cleveland Browns) to $117.84 (New England Patriots) for the average game ticket. Though the league will not open its books, numbers for the publicly-held Green Bay Packers ("Packers") offer some insight into what teams reap at the ticket office and concession stands. In 2010, the Packers cleared $60,059,646 from home and away game tickets plus private boxes. Projected over 32 teams, that's nearly $2 billion annually. The Packers reaped $13 million from concessions, parking and local media in 2010, which translates to $416 million on a league-wide basis.

33.     The class members will seek future employment with one or more of the defendant teams in interstate commerce as professional football players.

13

## FACTUAL ALLEGATIONS

### The NFL's Monopoly Power

34.    As noted above, the NFL Defendants possess monopoly power in the market for major league professional football in the United States, and have willfully acquired or maintained that monopoly power in violation of Section 2 of the Sherman Act. The relevant market for assessing the restraint of trade at issue is the market for the services of major league professional football players in the United States. As noted above, Defendants have monopoly power within that market and have repeatedly been found to have abused that power in violation of the federal antitrust laws.

35.    The NFL Defendants comprise the only major professional football league in the United States. The NFL Defendants are the only United States market participants for the services of major league professional football players. Together, they monopolize and/or restrain trade in the United States market for the services of major league professional football players. The only actual or potential competition that exists in this market is among the separately-owned and independently-operated NFL teams. Rather than engaging in competition for the players' services, however, the NFL Defendants have combined and conspired to eliminate such competition among themselves for NFL players through group boycotts, price-fixing arrangements, and concerted refusals to deal. This is being accomplished by the NFL Defendants jointly adopting and imposing "rules" and "policies," including the lockout, that have the purpose and effect of preventing players from offering their services to NFL teams in a competitive market.

**The SSA And Successive CBAs**

      36.    The NFL is a recidivist violator of the antitrust laws as reflected in *USFL, Mackey, McNeil II* and *III, Smith* and *Jackson.*

      37.    After the jury verdict in *McNeil III*, the NFL and players entered into a Stipulation & Settlement Agreement ("SSA") on February 26, 1993. A month later, the NFLPA advised the NFL that it had received authorization from a majority of players to serve as their collective bargaining agent. The district court approved the settlement agreement in *White v. NFL*, 822 F.Supp. 1389 (D. Minn. 1993).

      38.    Also in 1993, the NFL and NFLPA entered into a CBA that mirrored the SSA. The parties amended and extended the CBA in 1996, 1998, and 2002. In 2006, the parties renegotiated the CBA for 2006-2012, creating the CBU described above. On May 20, 2008, the NFL opted out of the final two years of the then-current versions of the CBA. As a consequence, the CBA was due to expire as of March 4, 2011. *See White v. NFL*, No. 4-92-906 (DSD), 2011 WL 706319 at *1 (D. Minn. March 1, 2011) ("*White II*"). The opinion in *White II* is attached as Exhibit A to this complaint and incorporated by reference herein.

      39.    The various iterations of the CBA had an Article XVII dealing with the EPP or Rookie Cap, which was a subset of the overall salary cap for NFL clubs. In the 1993 CBA, the EPP was originally set at $56 million or $2 million per club and was increased to 3.5 percent of "Defined Gross Revenues" ("DGR") for the first capped year of 1994. After 1994, the EPP was initially allowed to grow at the same annual rate as DGR until the 1998 CBA, when pool growth was limited to 10 percent. Beginning with

the 2002 iteration of the CBA, the EPP was frozen for 2002-03 and held to five percent growth thereafter. This system is reflected in the 2006 CBA, where EPP is set at the previous year's level (excluding "Formula Allotments" ("FAs")) for compensatory draft selections increased by the same percentage as the projected "Total Revenue" ("TR") for that year over the prior year up to a level of five percent. FAs for draft selections were set by the NFL and NFLPA "and shall not be disclosed to Clubs, Players, Player Agents or the public." 2006 CBA, §XVII(4)(j). Under this system, the rookies' share of the overall players' salary cap was cut from 6.5 percent in 1997 to 3.7 percent by 2009. In 2009, rookies made up 16.4 percent of NFL rosters but the rookie share was limited to just two percent of total revenue, leaving 55 percent for veteran players.

40.     A 2007 article that did an economic analysis of the EPP came to the conclusion that:

> In summation, rookie contracts are not only constrained by a franchise Rookie Cap, but in general are further constrained by an agreed upon valuation of each draft pick's worth. This valuation is not the result of market forces, the same interplay of supply and demand that determines veteran contracts, but rather is the result of a well-protected formula that artificially depresses rookie contracts.

41.     Major League Baseball ("MLB") has nothing analogous to the Rookie Cap. Even some NFL club representatives, such as William Polian, President of the Indianapolis Colts, have conceded that the Rookie Cap should be substantially changed or eliminated.

**The NFL's Decision to Terminate the SSA and CBA And Engage In A Lockout**

42.     As reported by ESPN, shortly after the NFL and NFLPA entered into the March 2006 iteration of the CBA, the NFL club owners began to consider the possibility of a lockout. The word "lockout" became a popular term among owners. According to witness testimony and documents filed in recent litigation over NFL television contracts, a lockout was on the agenda of all NFL owners' meetings in 2007 and early 2008.

43.     Internal NFL documents and testimony from NFL Commissioner Roger Goodell ("Goodell") in *White II* indicated that the NFL club owners knew early in 2008 that "in order for them to get a new labor deal that works for them, they need to be able to sustain a lockout, which requires financing and requires proper planning." Dallas Cowboys' owner Jerry Jones told his fellow owners that they "needed to realistically assume they were locking out in 2011" to obtain a CBA that "worked for them."

44.     The "financing" aspect of a lockout involved securing, in effect, "lockout insurance" from broadcasters with whom the NFL had existing contracts. As the court in *White II* explained (2011 WL 706319 at *2) (citations omitted):

> Soon after opting out of the CBA, the NFL began to negotiate extensions of its broadcast contracts. Rights fees in the broadcast contracts generate approximately half of the NFL's total revenues. Existing broadcast contracts effectively prevented the NFL from collecting revenue during a lockout in 2011 because the contracts did not require broadcasters to pay rights fees during a lockout or required the NFL to repay lockout fees in 2011. Moreover, some of the NFL's loan obligations include "average media revenues" covenants which provide that an "event of default" occurs if average annual league media revenues fall below a specified value. The NFL worried that its creditors could argue that a default event had occurred if the NFL locked out the Players in 2011,

17

the same year that some broadcast contracts were set to expire, and that a default would give the Players bargaining power in labor negotiations. In light of "market conditions and strategic considerations," the NFL understood that it was "prudent to consider [broadcast contract] extension alternatives today."

45.     As of May of 2008, the NFL had television broadcasting contracts with DirecTV for the 2006-10 seasons, with CBS, FOX and NBC, respectively, for the 2006-11 seasons, and with ESPN for the 2006-13 seasons.

46.     Beginning in July of 2008, the NFL began to negotiate a contract extension with DirecTV. The resulting extended contract provided that DirecTV would pay a substantial fee if the 2011 season was not cancelled and up to 9% more, at the NFL's discretion, if the 2011 season was cancelled. "As a result, the NFL could receive substantially more from DirecTV in 2011 if it locks out the Players then if it does not." *White II*, 2011 WL 706319 at *2.

47.     In April of 2009, the NFL began negotiating with CBS and Fox. Under the existing contracts, the broadcasters had to pay rights fees during a work stoppage, but would be entitled to refunds for the first three cancelled games during the affected season and for the remaining cancelled games during the following season. Under the renegotiated contracts, the the requirement that the NFL repay rights fees attributable to the first three lost games in the affected was eliminated and the NFL could repay the funds, plus money-market interest, over the term of the contract. If an entire season was cancelled, the contracts were automatically extended for an additional season. "Initially, FOX expressed reluctance to pay rights fees during a work stoppage. Goodell

Direct Test. 19. The NFL considered opposition to the work-stoppage provision a 'deal

breaker[ ].'" *White II*, 2011 WL 706319 at *3. The NBC contract negotiation,

commenced in March of 2009, contained similar concessions.

      48.    In the fall of 2009, the NFL negotiated with ESPN that: (a) ESPN

would, at the NFL's discretion, pay up to the full rights fee during a work stoppage; (b) a

credit for the first three cancelled games of the season would be applied the same year;

(c) the NFL could request less than the full rights fee; and (d) the NFL would repay the

funds, with LIBOR interest plus 100 basis points, over the term of the contract. If an

entire season was cancelled, the contract would be extended for an additional season. The

NFL was not liable to repay more than ESPN's yearly rights fee. As part of this deal,

ESPN got certain additional digital rights. "ESPN agreed to pay rights fees for July 2010

through July 2014. ESPN requested that the fee not be payable in the event of a work

stoppage, but the NFL rejected the request. The NFL stated that the digital deal and the

work-stoppage provisions were 'linked.'" *White II*, 2011 WL 706319 at *4 (citations

omitted).

      49.    The court in *White II* found (2011 WL 706319 at *8):

> However, under the terms of the SSA, the NFL is not entitled
> to obtain leverage by renegotiating shared revenue contracts,
> during the SSA, to generate post-SSA leverage and revenue
> to advance its own interests and harm the interests of the
> Players. Here, the NFL renegotiated the broadcast contracts to
> benefit its exclusive interest at the expense of, and contrary
> to, the joint interests of the NFL and the Players. This conduct
> constitutes "a design ... to seek an unconscionable advantage"
> and is inconsistent with good faith.

50. As an example of this bad faith, the court in *White II* offered the following (2011 WL 706319 at *12 n.4 (citation omitted)):

> The NFL's "Decision Tree" is one glaring example of the NFL's intent and consideration of its own interests above the interests of the Players. Moving forward with a deal depended on the answer to the question: "Does Deal Completion Advance CBA Negotiating Dynamics?" If yes, the NFL should "Do Deal Now"; if no, the NFL should "Deal When Opportune."

A copy of this "Decision Tree" is attached as Exhibit B to this complaint. Similarly, an internal NFL document entitled "Key Current NFL Media Objectives" (attached as Exhibit C to this complaint) referred to "secur[ing] access to revenue in 2011 if a work stoppage occurs"; this would permit "greater leverage in upcoming labor negotiations." Other internal NFL documents (attached as Exhibits D and E to this complaint) referred to "shift[ing] leverage in labor negotiations away from Union…ability to pull money into a Work Stoppage year" and using revised broadcasting contracts as "leverage in negotiations…no hold up value for union." Goodell and NFL CEO Steve Bornstein conceded in testimony in *White II* that the lockout insurance was a critical element in renewing the broadcast deals.

51. As a result of these broadcasting contract renegotiations, the NFL obtained a $4 billion war chest to use against the NFLPA in the event of a lockout.

52. The "planning" aspect of the NFL's lockout strategy was explained in an ESPN article:

> The owners' planning was equally bold. The league and its lawyers knew the players had been highly successful in antitrust litigation against the owners in the past, as a series of

cases led by the late union leader, Gene Upshaw, resulted in skyrocketing salaries, bonuses for players and free agency and vastly increased health and disability benefits. If a lockout was to succeed, the owners reasoned, they must do something about their exposure to antitrust liabilities. In a development that stunned lawyers, judges and law professors across the nation, the league and its attorneys asked the U.S. Supreme Court to review a case the NFL had already won, arguing for an expansion of the decision to a total exemption from antitrust scrutiny. If the league's strategy had been successful in *American Needle Inc. v. NFL*, it would have eliminated the most formidable weapon the players had in their quest for fair treatment from team owners.

But in a 9-0 decision, the Supreme Court rejected the league's claim of immunity from antitrust laws. It was a humiliating end to an owner strategy that could have changed the entire landscape of sports labor. As a result, the league likely faces another antitrust lawsuit from the players in Doty's courtroom, which, based on their track record there, is the last place the owners want to be.

53.     The NFL's planning for a lockout took other forms as well.

54.     NFL club owners began imposing lockout clauses in coaches' and executives' contracts that gave clubs the right to reduce compensation in the event of a lockout. Examples of such clauses included language allowing the clubs to reduce, terminate, or suspend the contract on 20 days' notice, reduce salary by 50 percent if a lockout continued for more than 90 days, terminate the employee without pay on 60 days' notice, and extend the contract another year at the same terms as 2011 if at least eight NFL games are canceled due to a lockout.

55.     In February of 2008, the NFL asked the United States Court of Appeals to end the jurisdiction of District Judge David Doty over the free agency/salary

cap system. The NFL claimed that Judge Doty was biased in favor of the players. The appellate court rejected this contention. *White v. NFL*, 585 F.3d 1129, 1138-41 (8th Cir. 2009).

56.    In March of 2008, the NFL retained veteran labor-relations attorney, Bob Batterman ("Batterman"), as outside counsel. Batterman is widely credited for orchestrating the 2004-05 lockout in the National Hockey League.

57.    In December of 2008, the NFL began a strategic and premeditated course of action designed to reduce expenses by laying off 15 percent of its staff.

58.    In March of 2009 at the annual NFL owners' meeting, the NFL club owners passed a resolution allowing all NFL teams to opt out of a defined benefit pension plan for NFL coaches and executives. As a result, nine teams have opted out of the league's established policy and now provide less beneficial pension plans to coaches and executives.

59.    In December of 2009, the NFL informed the NFLPA of its intent to terminate the Supplemental Revenue Sharing ("SRS") program that purportedly promotes competitive balance and helps the lower-revenue clubs compete. Andrew Brandy, the former Vice-President of the Green Bay Packers, described the NFL's decision to pull out of the SRS plan as "sending a clear message to its players and the union that the teams that want to go under the floor and cut team payroll to pre-2006 levels, say $85-$90 million…will now have a legitimate reason for doing so."

60.   In February of 2010, The NFL launched a new website, www.NFLlabor.com, to exclusively address labor matters and present the league's position on negotiations with the NFLPA.

61.   In February of 2010, the NFLPA initiated proceedings against the league because it discovered that the NFL did not provide its lower-revenue clubs with all of the SRS that was promised in the CBA for the years 2006-08.

62.   In that same month, the NFL announced the hiring of former NFLPA President Troy Vincent as Vice-President for Player Development for Active Players, less than a year after he lost the election to be the NFLPA's Executive Director and as the league and union are engaged in contentious negotiations for a new CBA. The timing of the hiring raised questions about the league's motives; William Gould, former Chairman of the National Labor Relations Board ("NLRB"), said it was quite uncommon for management to hire a former leader of the union it negotiates against during the midst of collective bargaining.

63.   In that same month, the NFL rejected the NFLPA's proposal to continue the salary cap system for an additional year.

64.   In August of 2010, the NFL team executives negotiated contracts of the 2010 first-round draft picks in a manner that reflected their belief that there would be a lockout in 2011 by changing the payment date of option bonuses from the first two weeks of the league year, which begins in March, to around the time the first regular-season game is played in 2011, whenever that might be.

65.     In September of 2010, the NFL informed its employees of its three-phase plan that will require many of its employees to take unpaid leaves of absences as well as pay cuts.

66.     In October of 2010, the NFL's political action committee, "Gridiron PAC," made donations to Speaker Nancy Pelosi, both the House Minority and Senate Majority leaders and the chairmen of the House and Senate judiciary committees, who oversee the league in numerous capacities, as well as several other influential lawmakers. An Associated Press report stated: "The union wants Congress to use its leverage to help prevent a lockout. The NFL, by contrast, wants Congress to butt out."

67.     In October of 2010, the NFL required banks lending to its teams to extend the traditional six-month grace period for declaring a default to stretch instead through to the end of the 2011 season in preparation for a lockout.

68.     In the context of these ongoing developments, the NFL and NFLPA were negotiating a new CBA for over two years before the efforts failed.

69.     Initially, NFL club owners had three proposals: The first was to reduce the players' salary cap revenue base by allowing an 18 percent increase in new stadium cost credits. This base reduction would cut the players' share of total revenue (57.5 percent in 2009) by about 10 percent. The second proposal sought to modify the existing EPP by imposing a rookie wage scale. In their third proposal, the NFL club owners wanted to increase the regular season from 16 to 18 games by reducing the preseason from four to two games.

70.    Throughout these negotiations, the NFLPA sought to obtain information from the NFL that would back up the latter's demands.  Exhibits F through K are copies of letters sent by Richard Berthelsen, General Counsel for the NFLPA, to NFL representatives on August 6, 2009 and on May 18, June 7, July 8, October 27, and December 15, 2007 asking for information on NFL club costs, television contracts and insurance and benefits. As several of the letters reflect, the NFL was not all that forthcoming in providing some of this information. NFL club members declined to attend negotiation sessions with representatives of the NFLPA.

**Renunciation By The NFLPA And The NFL's Lockout**

71.    On February 10, 2011, the NFL filed a charge against the NFLPA with the NLRB, accusing the union of failing to negotiate in good faith.

72.    Four days later, federal mediator George Cohen ("Cohen") was brought in and numerous days of mediation ensued in which the parties extended the expiration date of the CBA several times.

73.    The mediation was unsuccessful. On March 11, 2011, Cohen issued the following statement:

> [T]he parties have not achieved an overall agreement, nor have they been able to resolve the strongly held, competing positions that separated them on core issues.
>
> In these circumstances, having reviewed all of the events that have transpired, it is the considered judgment of myself and Deputy Director Scott Beckinbaugh, who has been engaged with me throughout this process, that no useful purpose would be served by requesting the parties to continue the mediation process at this time.

A copy of Cohen's statement is attached as Exhibit O.

74.     On March 11, 2011, DeMaurice Smith ("Smith"), Executive

Director of the NFLPA, sent a letter to all NFL Club Presidents and General Managers,

informing them that the NFLPA had "renounced its status as collective bargaining agent

for all NFL players." As a result, no NFLPA representative "has the authority or

authorization to engage in any collective bargaining discussions, grievance processing or

any other activities associated with collective bargaining on behalf of players at either the

club or the league level." The letter stated that the NFLPA would also no longer be

overseeing the activities of player agents. A copy of this letter is attached as Exhibit L to

this complaint. On the same day, Smith sent a similar letter to Goodell, which is attached

as Exhibit M to this complaint.

75.     The practical significance of these communications was explained in

*Powell v. NFL*, 764 F. Supp. 1351, 1358-59 (D. Minn. 1991) (footnote and citations

omitted):

> Based on the foregoing, the court holds that the plaintiffs are
> no longer part of an "ongoing collective bargaining
> relationship" with the defendants. The NFLPA no longer
> engages in collective bargaining and has also refused every
> overture by the NFL defendants to bargain since November of
> 1989. The NFLPA further has abandoned its role in all
> grievance arbitrations and has ceased to regulate agents,
> leaving them free to represent individual players without
> NFLPA approval. The plaintiffs have also paid a price for the
> loss of their collective bargaining representative because the
> NFL defendants have unilaterally changed insurance benefits
> and lengthened the season without notifying the NFLPA.
>
> Because no "ongoing collective bargaining relationship"
> exists, the court determines that nonstatutory labor exemption

26

has ended. In the  absence of continued union representation, the Eighth Circuit's rationale for the exemption no longer applies because the parties may not invoke any remedy under the labor laws, whether it be collective bargaining, instituting an NLRB proceeding for failure to bargain in good faith or resorting to a strike.

*Accord McNeil II*, 790 F.Supp. at 883-84.

76.    By March 11, 2011, the NFLPA had amended its bylaws to prohibit it or its members from engaging in collective bargaining with the NFL, the NFL's member clubs or their agents.

77.    The NFLPA is in the process of filing a labor organization termination notice with the United States Department of Labor.

78.    An application is being filed with the Internal Revenue Service to reclassify the NFLPA for tax purposes as a professional association rather than a labor organization.

79.    On March 11, 2011, the NFL sent a letter to Smith announcing its intention to commence a lockout on March 12. A copy of that letter is attached as Exhibit N to this complaint. The lockout took effect at the appointed time.

80.    On March 11, 2011, certain NFL players filed a lawsuit against the NFL in connection with some of the events described herein, alleging various antitrust, contract and tort theories. *Brady v. NFL*, No. 0:11-cv-00639 SRN JGG (D. Minn.). A preliminary injunction hearing in that case is currently scheduled for April 6, 2011.

81.     After the filing of that lawsuit, on March 17, 2011, Goodell wrote directly to NFL players, presenting the league's side of the controversy. Certain players responded on March 19, pointing out the deceptions contained in Goodell's letter.

82.     The position taken by the NFL in the aforementioned lawsuit is that the lockout will continue until the NLRB rules on the league's complaint, which could take many months, if not years. As explained above, however, members of the class were, as of March 11, 2011, not members of the collective bargaining unit described in the 2006 CBA and the pendency of any NLRB ruling would have no effect on them.

83.     Reaction to the NFL's lockout strategy has been negative, even before it was effectuated. A *New York Times* article quoted Fay Vincent, the former Commissioner of MLB, as saying: "[b]ut it's hard to look at these circumstances and not see a case of owners' [sic] wanting their cake and eating it, too." As he added: "[t]he N.F.L. is the premier sports business in the country by a large margin....There is only one way to go, and that is down. It's pretty dangerous to tamper with fans' passion and good will."

84.     Similarly, in the March 21, 2011 issue of *New Yorker*, economic analyst James Surowiecki noted:

> You might say that .that's capitalism--those who provide the capital for an enterprise deserve to reap the profits. But the N.F.L. isn't capitalist in any traditional sense. The league is much more like the trusts that dominated American business in the late nineteenth century, before they were outlawed. Its goal is not to embrace competition but to tame it, making the owners' business less risky and more profitable. Unions are often attacked for trying to interfere with the natural workings of the market, but in the case of football it's the owners, not

the union, who are the real opponents of the free market.
They have created a socialist paradise for themselves that
happens to bring with it capitalist-size profits. Bully for them.
But in a contest between millionaire athletes and billionaire
socialists it's the guys on the field who deserve to win.

85.     Jonathan Weiler, Professor of International Studies at the University

of North Carolina Chapel Hill has likewise noted that players, not club owners, bear the

brunt of any lockout:

But the two sides are not really comparable. Yes, there are
many wealthy players in the NFL, but the vast majority will
not be for most of their lives.

If they stick on NFL rosters for a full season or more, they
make great salaries by normal standards. But the average
NFL player won't last four years in the league and this is, in
itself, a misleading figure, because there are plenty of players
who last 10-15 years. So, if the average player tenure in the
league is 3.6 years..., the median tenure of an NFL player,
which is a much more relevant gauge of the life of a typical
player, is less than that figure implies.

The media (and the owners) spend a lot of time focusing on
the salaries of players like Sam Bradford and Albert
Haynesworth. But for every Haynesworth or Bradford, there
are dozens of players who may make the league minimum for
the short duration in which they play in the league. And given
the significant long-term health problems that many NFL
players face, the impact of those problems on their job
prospects, the bills they owe, those few years of good
earnings can evaporate quickly. No NFL owner is ever going
to be out on the street. By contrast, NFL players do find
themselves there (remember Hall-of-Fame center Mike
Webster?).

In sum, every single owner is insanely wealthy by any
reasonable standard and will remain so for the rest of their
lives. The same cannot be said of many players....

But it's much worse than the simple fact that the majority of players who put on an NFL uniform at some point will not last in the league very long nor make a ton of money.

One central justification under capitalism for rewarding some people with great wealth is the risk they take to achieve that wealth. That risk, while pursued for the sake of self-interest, contributes to a greater good in the form of innovation and wealth creation. No such risk accrues to NFL owners, however. Once you are granted a franchise, you are granted a license to print money. Incompetent owners may cost their team wins on the field, but they will still make a killing off the field.

NFL revenues run to $8 billion a year and, as Forbes magazine frequently points out, many other benefits redound to owners of sports franchises, even if those benefits don't show up on franchise balance sheets. King writes that it's a burdensome new reality for NFL franchises that they have to finance new stadiums on their own, rather than have taxpayers pay for them. Only in the outrageously entitled world of the super-wealthy would it be burdensome that rather than being handed a billion dollar asset, they might actually have to pay for it themselves. And Jerry Jones' new stadium, for example, was built with an estimated quarter of a billion dollars in public funds. Furthermore, if building new stadiums weren't a profitable endeavor in the long run, let me assure you that teams wouldn't be building them in the first place.

The stadium financing issue aside, the risk in the NFL is all on the side of the players. They are the ones who exist in an intensely competitive market for talent. And they are the ones who put their bodies on the line everyday. It's the players, not the owners who, in football especially, but to lesser degrees in other sports, risk the possibility of a lifetime of pain and discomfort or, as the evidence about the long-term effects of brain trauma increasingly shows, depression and suicide (and those realities the NFL spent many years denying).

Rutgers' Eric LeGrand, paralyzed from the neck down Saturday night in an on-field collision, is only the latest reminder of this simple, indisputable fact: the risk is all on the

side of the players. All of it. The owners cannot lose and they don't lose. Period. The players can lose catastrophically. Remarkably, while King does discuss the players' concerns about pensions and health care for retired players, he fails to mention the long-term health consequences from playing football, as if that has no relevance to the players' views about much of the league's revenue they're entitled to.

****

The owners win when media focus on things like the rookie wage scale, 60% revenue sharing, and the like. The owners lose when media point out that only the players are putting their lives and bodies on the line in a cauldron of intense competition. The reality is that owners of sports franchises are, in many cases, spoiled brats who expect to make impossibly large sums of money by dint of the fact that, since they are already rich, they are entitled to become richer still. They assume virtually no risk, earn massive sums of guaranteed money regardless of the product they put on the field and still feel a need -- with the indispensable aid of Commissioner Goodell -- to distort basic facts about the nature of sports economics and their own profitability.

As I wrote a few years ago, in the context of growing evidence of the devastating long-term impact of traumatic brain injury on retired NFL players, this is especially indefensible.

And remember one more thing -- when there is a work stoppage in sports, it's almost always blamed on the players. But the 2011 season, if it isn't played, will be because of an owners' lockout, not a players' strike. And in keeping with their true nature, the owners have announced that, if there is a lockout, they will stop paying for players' health insurance, though they are still estimated to receive an estimated $1 billion in TV revenue next year, regardless of whether a game is played.

86.     The concerns about brain injuries to former NFL players caused by concussions during their service in the league have been increasing in recent years as a

result of several studies of former NFL players. An article in the *New York Times* dated

October 21, 2010 reported the following:

> A 2000 study surveyed 1,090 former N.F.L. players and found more than 60 percent had suffered at least one concussion in their careers and 26 percent had had three or more. Those who had had concussions reported more problems with memory, concentration, speech impediments, headaches and other neurological problems than those who had not, the survey found.

> A 2007 study conducted by the University of North Carolina's Center for the Study of Retired Athletes found that of the 595 retired N.F.L. players who recalled sustaining three or more concussions on the football field, 20.2 percent said they had been found to have depression. That is three times the rate of players who have not sustained concussions.

> As scrutiny of brain injuries in football players has escalated in the past few years, with prominent professionals reporting cognitive problems and academic studies supporting a link more generally, the N.F.L. and its medical committee on concussions have steadfastly denied the existence of reliable data on the issue.

> But in September 2009, a study commissioned by the N.F.L. reported that Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population — including a rate of 19 times the normal rate for men ages 30 through 49.

## The NFL's Imposition of Anticompetitive Restrictions Upon NFL Players

87.    Upon information and belief, the NFL Defendants have jointly

conspired and agreed to impose the aforementioned lockout prohibiting all competition

for player services, player signings, and employment and/or a system of anticompetitive

restraints on player movement, salaries, contract signings, and payment of compensation and health benefits due under existing contracts or plans.

88.    As part of this lockout, all NFL Defendants have conspired and agreed, *inter alia*, to prevent NFL teams from negotiating, or even communicating with, or employing NFL players, thereby completely eliminating a competitive market for player services. In addition, NFL teams have conspired and agreed not to honor existing contracts with NFL players, by not paying them and precluding their access to team facilities and personnel.

89.    The owners' collective purpose in imposing the lockout is to ensure the continuance of the league's illegally obtained monopoly and the profits derived therefrom by forcing the non-unionized NFL prospective players to agree to wage, revenue and benefit reductions and anticompetitive restrictions.

90.    The lockout by the NFL Defendants constitutes an illegal group boycott, price-fixing agreement, and/or restraint of trade in violation of the Sherman Act, under both the *per se* rule and the rule of reason standard.

91.    The NFL and its teams have also announced that they will hold the 2011 College Draft on April 28-30, 2011. The College Draft is one of the longest-running restraints on competition for player services in the NFL. It has the purpose and effect of dividing the market for first year or "rookie" player services among the NFL teams, who would otherwise compete against each other for rookie players, through a number of anticompetitive restraints, including a limitation on the compensation that can be paid to those players.

92.    As described above, for College Drafts prior to the 2011 College

Draft, the SSA and CBA provided for a limitation on compensation to drafted players by

what was known as the EEP or Rookie Cap.

93.    There was no agreement in the SSA or 2006 CBA concerning an

EEP or any similar restraint, for the 2011 College Draft or any College Draft thereafter.

94.    The limitation on total compensation embodied by the College Draft

with an EEP or any similar restriction will be enforced by a group boycott among the

NFL Defendants.  This group boycott takes the form of a concerted refusal to deal with

potential NFL players except through restrictive anticompetitive practices, including a

price-fixing agreement. The conspiracy with respect to the College Draft with an EEP has

been furthered by the lockout described above.

**The Irreparable Injuries of Plaintiff, the Class And The Public**

95.    Upon information and belief, the NFL Defendants intend to continue

imposing their lockout, the College Draft with EEP and/or other restrictions with

anticompetitive effects.  Absent such restrictions, the class members would be free to

offer their services to NFL teams in a competitive market.  Class members and the public

will suffer severe and irreparable harm if they are prevented from working during the

2011 NFL off-season and season and offering their services to NFL teams in a

competitive market.

96.    The injuries which the class members are incurring and will continue

to incur will not be fully compensable by monetary damages.  This is particularly true

due to the short length of NFL careers (the average length of which is 3.6 years), the

34

virtually constant need for NFL players to demonstrate their skill and value on the football practice and playing fields, the life-threatening injuries caused to many former NFL players as a result of their service to the NFL, and the difficulty in estimating and proving the amount of monetary damages suffered by Plaintiff as a result of the NFL Defendants' unlawful conduct.  The threatened injuries to the Plaintiff and class members are irreparable, warranting the issuance of preliminary and permanent injunctive relieve for the class.

97.     Rookies who are deprived of the ability to play in the 2011 NFL season also suffer irreparable injury in that if they do not play because of the lockout, their careers are shortened and they will be in the unenviable position of competing for slots on NFL clubs against the rookie contingent available during the year that play resumes. They are also denied honors that may enhance their careers. And they are put at a greater risk of injury when they do return because of not having played for months or perhaps years.

98.     The public interest is also affected by the NFL's lockout. As noted above, millions of NFL fans watch NFL games in person or on television. They will be injured irreparably by a continuation of the lockout that would cause cancellation of the 2011 NFL season. Player and league records would not be achieved, existing records would not be broken and an entire NFL season would be lost.

## COUNT I

## Violation of Section 1 of The Sherman Act

99.    Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs.

100.    There is a relevant market for the services of major league professional football players in the United States.  The lockout orchestrated by the NFL Defendants will substantially restrain and injure competition in that market and will continue to do so.

101.    The lockout constitutes an agreement among competitors to eliminate competition for the services of major league professional football players in the United States and to refuse to pay contractually-owned compensation to players currently under contract with the NFL Defendants for the 2011 season and beyond, in violation of Section 1 of the Sherman Act.

102.    The lockout operates as a perpetual horizontal group boycott and price-fixing agreement, which is unlawful per se.

103.    The lockout also constitutes an unreasonable restraint of trade under the rule of reason.  The NFL Defendants have monopoly power in the relevant market.  The NFL Defendants' group boycott and price-fixing agreement is a naked restraint of trade without any pro-competitive purpose or effect.  In fact, its stated objective is to reduce player wages that would have otherwise prevailed in a competitive market.  Moreover, the lockout agreement is not in any way necessary for the production of NFL football or the achievement of any procompetitive objective.

36

104.    The lockout is being undertaken in furtherance of other anticompetitive practices engaged in by the NFL Defendants, including, *inter alia*, the College Draft with EEP.

105.    Each of the NFL Defendants is a participant in this unlawful combination or conspiracy.

106.    The Plaintiff and class members have suffered and will suffer antitrust injury to their business or property by reason of the continuation of this unlawful combination or conspiracy.  The lockout has injured and will continue to injure Plaintiff and class members by depriving them of the ability to work as, receive contractually-mandated compensation for, and/or offer their services as professional football players in a free and open market.

107.    Monetary damages are not adequate to compensate Plaintiff or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

## COUNT II

### Declaratory Judgment:   Interpretation of the SSA

108.    Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs.

109.    Article XX, Section 1, of the SSA provides: "[p]ursuant to the Final Consent Judgment in this Action, the Court shall retain jurisdiction over this Action to effectuate and enforce the terms of this Agreement and the Final Consent Judgment." Thus, this Court has exclusive jurisdiction to enforce and interpret the terms of the SSA.

110.    Article XVIII, Section 5(b) of the SSA provides:

> In effectuation of this Agreement, the Parties agree that, after
> the expiration of the express term of the CBA, in the event that
> at that time or any time thereafter a majority of players indicate
> that they wish to end the collective bargaining status of any
> Players Union on or after expiration of any such CBA, the
> Defendants      and      their      respective      heirs,      executors,
> administrators, representatives, agents, successors and assigns
> waive any legal rights they may have to assert any antitrust
> labor exemption defense based upon any claim that the
> termination by the players or any Players Union of its status as
> a collective bargaining representative is or would be a sham,
> pretexts, ineffective, requires additional steps, or has not in fact
> occurred.

111.    Pursuant to the foregoing article, the NFLPA on March 11, 2011

renounced its representative status "on" the date of the expiration of the 2006 CBA.

112.    Plaintiff and class members seek a declaration, pursuant to 28 U.S.C.

§ 2201, that, under the SSA, the NFL Defendants have waived any right to assert any

labor exemption defense based on any claim that the players' decision to terminate the

status of the NFLPA as their collective bargaining representative is in any way a sham,

pretext, ineffective, requires additional steps, or has not in fact occurred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment with respect to his Complaint

as follows:

1.    Certifying the class proposed in this Complaint pursuant to Fed. R.

Civ. P. 23(b)(1) and 23(b)(2);

2.    Declaring that the lockout violates Section 1 of the Sherman Act,

and enjoining it;

3.    Declaring that the NFL Defendants' future imposition of the anticompetitive Draft with an EPP violates Section 1 of the Sherman Act, and enjoining any implementation of the 2011 College Draft until the issues related to the antitrust violations are resolved;

4.    Enjoining the NFL Defendants from agreeing to deprive the players of the ability to work as professional football players or negotiate the terms of that employment in a competitive market;

5.    Declaring that, pursuant to the SSA over which this Court has exclusive jurisdiction, the NFL Defendants have waived any right to assert any antitrust labor exemption defense based upon any claim that the termination of the NFLPA's status as the players' collective bargaining representative is a sham, pretext, ineffective, required additional steps, or has not in fact occurred;

6.    Enjoining NFL Defendants from taking any punitive or discriminatory actions against Plaintiff or class members;

7.    Placing all disputed sums at issue in this litigation in escrow until a judgment or settlement is reached in this matter;

8.    Awarding Plaintiff his costs and disbursements in this action, including reasonable attorneys' fees;

9.    Granting Plaintiff and class members such other and further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff

demands a trial by jury.

Dated:   April 5, 2011

Respectfully Submitted,

Michael D. Hausfeld
Hilary K. Scherrer
HAUSFELD LLP
1700 K Street, NW
Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
mhausfeld@hausfledllp.com
hscherrer@hausfeldllp.com

Michael P. Lehmann
Jon T. King
Arthur N. Bailey, Jr.
HAUSFELD LLP
44 Montgomery Street
San Francisco, CA 94111
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeldllp.com
jking@hausfeldllp.com

Mark J. Feinberg (#28654)
Michael E. Jacobs (#0309552)
Shawn D. Stuckey (#0388976)
ZELLE HOFMANN VOELBEL &
MASON, LLP
500 Washington Avenue, South
Suite 4000
Minneapolis, MN 55415
Telephone: (612) 339-2020
Facsimile: (612) 336-9100
mfeinberg@zelle.com
mjacobs@zelle.com
sstuckey@zelle.com

Daniel S. Mason
ZELLE HOFMANN VOELBEL &
MASON, LLP
44 Montgomery Street
Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-0700

abailey@hausfeldllp.com

E. Kirk Wood
WOOD LAW FIRM, LLC
P. O. Box 382434
Birmingham, Alabama 35238-2434
Tel:  (205) 908-4906
Fax:  (866) 747-3905
Email:  ekirkwood1@bellsouth.net

Christopher T. Hellums
PITTMAN, DUTTON, & HELLUMS, P.C.
2001 Park Place North
1100 Park Place Tower
Birmingham, Alabama 35203
Tel:   (205) 322-8880
Fax:  (205) 328-2711
Email: chrish@pittmandutton.com

Joe R. Whatley, Jr.
WHATLEY, DRAKE & KALLAS LLC
1540 Broadway
37th Floor
New York, New York 10036
Tel:  (212) 447-7070
Fax:  (212) 447-7077
Email:  jwhatley@wdklaw.com

Facsimile: (415) 693-0770
damson@zelle.com

Samuel D. Heins (#43576)
Vince J. Esades (#249361)
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612)338-4692
sheins@heinsmills.com
vesades@heinsmills.com

*Attorneys for Plaintiff*